**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 98-50030

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RITA ALMANZAR

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas
(EP-97-CR-358-1-DB)

March 9, 1999

Before HIGGINBOTHAM, BENAVIDES, DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

Defendant-appellant Rita Almanzar ("Almanzar") was convicted by a jury of one count of knowingly and intentionally importing marijuana into the United States from Mexico, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); and one count of knowingly and intentionally possessing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). On appeal, Almanzar challenges her conviction with the sole argument that the Government failed to present sufficient evidence that Almanzar knew that the car she was

---

[*] Pursuant to 5th Cir. R.47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

driving had marijuana hidden in a secret compartment, an element necessary to prove both the importation and the possession charges. Based on our thorough review of the evidence presented to the jury, we conclude that the evidence as a whole viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of innocence and a theory of guilt, so that any reasonable juror necessarily must have entertained reasonable doubt. Hence, the Government failed to meet its burden of proof, so Almanzar's conviction must be reversed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 5:10 a.m. on April 9, 1997, Almanzar, a 40-year-old female U.S. citizen, drove a 1985 Honda Prelude into the primary inspection lane at the Paso Del Norte port of entry in El Paso, Texas. Almanzar was the sole occupant of the vehicle. The bridge at the port of entry connects El Paso to Ciudad Juarez, Mexico. Immigration inspector Gilbert Madriles ("Madriles") testified at trial that when he asked Almanzar for a declaration, he received no answer. When he asked Almanzar her citizenship, she told him she was a United States citizen. Madriles then asked Almanzar who owned the car, and she told him that it belonged to a friend. Madriles requested identification, and Almanzar said that she had none. When Madriles asked Almanzar if there was anything in the trunk of the car, she said no. Madriles admitted that he did not smell marijuana or air freshener in the car.

Madriles testified that Almanzar was "nervous" and that her behavior was "out of the ordinary." Specifically, he stated that

2

when he asked Almanzar for a declaration, "she hesitated to roll the window down." Madriles also testified that he saw "some eye contact" between Almanzar and the driver of a station wagon parked in the secondary inspection area ahead of her. Madriles admitted, however, that although the report that he prepared within one hour after Almanzar's arrest stated that she appeared nervous, his report did not give any reasons for this conclusion. Madriles also admitted that Almanzar maintained eye contact with him throughout his questioning. He could not recall whether Almanzar's hands were shaking.

Madriles testified that he asked Almanzar to open the trunk for a routine inspection, and inside the trunk he saw new rubber molding and fresh paint applied to Bondo or fiberglass, leading him to believe that the trunk had been altered. Madriles sent the car to the secondary inspection area, where a drug-sniffing dog alerted to the trunk.

Rolando Picazzo ("Picazzo"), a canine enforcement officer with the U.S. Customs Service, testified that he opened the trunk and saw that the spare tire well was covered by sheet metal. When he drilled into the metal and then withdrew the drill bit, it was covered with a green leafy substance that field-tested positive for marijuana.

Maria Ramirez ("Ramirez"), a U.S. Customs inspector, testified that she searched Almanzar and found no contraband or weapons. According to Ramirez, Almanzar asked her "what was going on because she had to go to work that day." Ramirez also testified that a

3

team from the National Guard used a saw to remove the sheet metal from the trunk, a procedure that took possibly as long as 45 minutes. Ramirez told the jury that under the sheet metal, agents found 13 bundles of marijuana weighing 51.5 pounds wrapped in clear plastic.

Ruben Atedero-Lopez ("Atedero-Lopez"), a special agent with the U.S. Customs Service, testified that before Almanzar's arrest, he had been investigating the station wagon, which was known as a load or spotter vehicle for drug smuggling. Atedero-Lopez testified that he had placed a lookout record on the Treasury Enforcement Communications System ("TECS") computer, requesting that the inspectors send the station wagon to secondary inspection and "also look for any associated vehicles that may be carrying a load." When Atedero-Lopez received notice that the station wagon had been spotted at the port of entry, he went to the customs headhouse, where he read Almanzar her *Miranda* rights and interrogated her.

Atedero-Lopez testified that Almanzar told him that at 11:00 p.m. the previous night, she had taken a taxi to Ciudad Juarez, and that she went to the Vertigo nightclub to meet her boyfriend of two months, Sergio Segura. Almanzar told the agent that she did not know where Segura lived and that she had no means of communicating with him other than meeting him at nightclubs. Atedero-Lopez also testified that Almanzar said that she had lost her purse, but she did not say when or how. Atedero-Lopez told the jury that Almanzar said that she had been "partying all night" with Segura, and that

4

at approximately 5:00 a.m. he had given her the key to his car so that she could drive back to El Paso because she was worried about going to work. He also testified that Almanzar said that she had placed the car key on the key ring with her house key. Atedero-Lopez admitted that he did not ask Almanzar whether she and Segura had made arrangements to return the Honda to him.

Atedero-Lopez testified that in a second conversation with Almanzar after her arrest, she told him that she had met Segura at the XO nightclub in Ciudad Juarez. He did not ask Almanzar why she initially said that she had met Segura at the Vertigo nightclub. He also told the jury that he asked Almanzar's daughter, Cynthia Jimenez, to bring him identification for her mother, and that Cynthia gave him an expired Texas driver's license, a health insurance card and a Social Security card. Atedero-Lopez admitted at trial that he did not take fingerprints from inside the trunk or from the plastic wrap covering the marijuana. He told the jury that during the interrogation Almanzar insisted that she had "nothing to do with this."

Maria Sepulveda ("Sepulveda"), an office manager at Mid-American Electro-Cords, where Almanzar had been employed as an assembler since 1995, testified that Almanzar's last day of work was Saturday, April 5, 1997, and that she had unexcused absences on April 7, 8 and 9. Sepulveda told the jury that a 24-hour written warning was sent to Almanzar on April 11, and that if Almanzar had responded within 24 hours, she would not have been fired. Sepulveda said that because Almanzar never received the warning

5

letter, and did not respond, she was terminated on April 14, 1997, effective retroactive to April 10, 1997. Sepulveda testified that she had known Almanzar for a long time and considered her to be a good employee.

Maribel Jimenez ("Maribel"), Almanzar's daughter, testified that her mother told her that she borrowed the Honda Prelude from a friend she met in a nightclub in Ciudad Juarez. Maribel stated that she had never heard of Sergio Segura.

Almanzar's other daughter, Cynthia Jimenez ("Cynthia"), who lives with Almanzar, testified that her mother previously had dated men in Ciudad Juarez and that, although she had never heard of Segura, she is usually familiar only with her mother's steady boyfriends. Cynthia also told the jury that when Agent Atedero-Lopez asked her to bring him her mother's identification, she gave him her mother's driver's license, Social Security card and health insurance card taken from her mother's dresser drawer, not from her purse. Cynthia testified that she too had been to the Vertigo and XO nightclubs, which are only a block apart, and that it was customary that if one club closed early, patrons could get into the other club free by showing a wristband from the closed club.

Almanzar did not testify at trial and the defense presented no witnesses. Almanzar moved for a judgment of acquittal at the end of the government's case-in-chief and at the close of evidence; these motions were denied. The jury found Almanzar guilty on both counts. The district court sentenced Almanzar to two concurrent sentences of 24 months and three years of supervised release.

6

Almanzar appealed.

## II.  STANDARD OF REVIEW

In reviewing challenges to the sufficiency of the evidence, we review the evidence, whether direct or circumstantial, in the light most favorable to the government, "drawing 'all reasonable inferences and credibility choices made in support of the verdict.'"  *United States v. Ortega Reyna,* 148 F.3d 540, 543 (5th Cir. 1998) (quoting *United States v. Ivy,* 973 F.2d 1184, 1188 (5th Cir. 1992), *cert. denied,* 507 U.S. 1022 (1993)).  This standard of review inquires whether any reasonable trier of fact could have found that the evidence established the essential elements of the crimes beyond a reasonable doubt.  *United States v. Anchondo-Sandoval,* 910 F.2d 1234, 1236 (5th Cir. 1990).  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."  *United States v. Lopez,* 74 F.3d 575, 577 (5th Cir.), *cert. denied,* 517 U.S. 1228 (1996).  "If the evidence tends to give 'equal or nearly equal circumstantial support' to guilt and to innocence," however, a "'reasonable jury must necessarily entertain a reasonable doubt,'" so that reversal is required.  *Ortega Reyna,* 148 F.3d at 543 (quoting *United States v. Sanchez,* 961 F.2d 1169, 1173 (5th Cir.), *cert. denied,* 506 U.S. 918 (1992)); *Lopez,* 74 F.3d at 577.

## III.  DISCUSSION

### A. General Principles

7

To sustain a conviction for the offense of possession of marijuana with intent to distribute, the Government must prove beyond a reasonable doubt that the defendant: (1) knowingly (2) possessed marijuana (3) with intent to distribute it. *Lopez,* 74 F.3d at 577. In order to prove the crime of importation of marijuana, the Government must establish that the defendant knowingly played a role in bringing the marijuana into the country. *Id.* To establish either crime, the Government must adduce sufficient evidence of "guilty knowledge." *Id.* Almanzar challenges only the "knowledge" element, contending that the Government failed to prove that she knew marijuana was concealed in the car she was driving.

Rarely can the Government prove by direct evidence the "knowledge" element of the crimes of possession or importation of illicit drugs. *Id.* However, knowledge of the presence of narcotics often may be inferred from the exercise of control over the vehicle containing illegal drugs. *Id.* "[C]ontrol of the vehicle will suffice to prove knowledge only where the drugs 'are clearly visible or readily accessible.'" *United States v. Pennington,* 20 F.3d 593, 598 (5th Cir. 1994) (quoting *United States v. Richardson,* 848 F.2d 509, 513 (5th Cir. 1988)).

In secret compartment cases, however, generally the knowledge element may not be inferred solely from the defendant's control of the vehicle in which the contraband is hidden because there "'is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the

8

unwitting defendant as the carrier in a smuggling enterprise.'" *United States v. Resio-Trejo,* 45 F.3d 907, 911 (5th Cir. 1995) (quoting *United States v. Diaz-Carreon,* 915 F.2d 951, 954 (5th Cir. 1990)). This assumption is heightened when, as here, the vehicle is a "loaner" or otherwise has been in the possession of the suspect for only a short time. *Ortego Reyna,* 148 F.3d at 544. Therefore, in hidden compartment cases, "'this Court has normally required additional "circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge."'" *Id.* (quoting *Resio-Trejo,* 45 F.3d at 911 (quoting *Anchondo-Sandoval,* 910 F.2d at 1236)).

The Government presented no direct evidence that Almanzar knew that marijuana was concealed in the car, such as Almanzar's fingerprints on the packets of marijuana or inside the trunk. Instead, the Government relied solely on circumstantial evidence to establish Almanzar's guilty knowledge.

On appeal, the Government argues that the following circumstantial evidence provides ample support for the jury's finding beyond a reasonable doubt that Almanzar acted with consciousness of guilt: (1) Almanzar appeared nervous when initially approached by the customs inspector at the primary inspection point; (2) Almanzar made frequent eye contact with the driver of the station wagon being detained at the secondary inspection point, a vehicle known by law enforcement officials to have been a load and spotter car; (3) Almanzar had no identification in her possession; (4) Almanzar provided conflicting

9

stories about which nightclub she had just left; (5) Almanzar was worried about getting back to El Paso and her job, but her employer reported that she had been missing without explanation for three days prior to her arrest; (6) Almanzar claimed that the car belonged to her boyfriend of two months, but she could not or would not provide his address or phone number.

## B. Circumstantial Evidence of Guilty Knowledge

### 1. Nervousness

Nervous behavior at an inspection station frequently constitutes persuasive evidence of guilty knowledge. *Diaz-Carreon,* 915 F.2d at 954. Nervousness, however, also may be "a normal reaction to circumstances which one does not understand," and being stopped at the border is certainly one of those situations. *United States v. Williams-Hendricks,* 805 F.2d 496, 500 (5th Cir. 1986). Evidence of nervousness is insufficient to support a finding of guilty knowledge in the absence of facts suggesting that the defendant's nervousness or anxiety was other than a "normal reaction to circumstances which one does not understand." *Id.; United States v. McDonald,* 905 F.2d 871, 874 (5th Cir.), *cert. denied,* 498 U.S. 1002 (1990).

Immigration inspector Madriles testified that Almanzar acted "nervous" at the primary inspection checkpoint. In a report written one hour after the seizure, however, Madriles did not document any reasons for his belief that Almanzar was "nervous." At trial, he admitted that Almanzar maintained eye contact with him throughout the questioning. *See Richardson,* 848 F.2d at 511

10

(inferring guilty knowledge in part from testimony that an "agent observed that Richardson was 'very uneasy, he wouldn't look at me, he wouldn't make any type of eye contact with me.'").  Inspector Madriles could not recall whether Almanzar's hands were shaking. *See United States v. Galberth,* 846 F.2d 983, 985 (5th Cir.) (physical signs of nervousness include shaking, quivering voice and throbbing artery in neck), *cert. denied,* 488 U.S. 865 (1988). Moreover, there was no testimony that Almanzar's nervousness increased as the search progressed.  *See McDonald,* 905 F.2d at 873 (McDonald was nervous when the inspector looked at the back seat, he relaxed when the inspector found nothing, and then his nervousness returned when the inspector turned his attention to the gas tank); *Diaz-Carreon,* 915 F.2d at 952 ("[a]s the customs inspector continued her questioning, Diaz-Carreon's previously friendly demeanor deteriorated into extreme and noticeable nervousness.  He became increasingly agitated and unable to communicate").

In explaining Almanzar's "nervousness," Madriles told the jury that "she hesitated to roll the window down" and "kept looking at the other fellow from secondary who was driving the station wagon." An equally plausible inference to be drawn from these facts is that an innocent woman, who had been driving a borrowed car for only a brief period, hesitated momentarily while trying to locate the button or the handle to lower the window.  *See Ortega Reyna,* 148 F.3d at 545 (defendant's "single [15 second] hesitation and downward glance fall well short of the generalized hesitancy to

answer questions or delayed responses that we [have] accepted as circumstantial evidence of guilty knowledge").

There was no testimony showing that the agents asked if Almanzar knew the driver of the station wagon or if the driver knew Almanzar. There was no evidence that any contraband was found in the station wagon, or that the driver was arrested for suspected criminal activity. The only "connection" between Almanzar and the driver was fleeting "eye contact." The Government presented no evidence of "connecting factors" recognized by this court as permitting an inference that two cars are traveling in tandem, with the first car acting as a "lead" or "spotter" car for the "load" car carrying contraband. Such "connecting factors" include the presence of two-way radios, similar license plates, or two vehicles traveling near each other in a sparsely populated area. *See United States v. Barnard,* 553 F.2d 389, 392 & n.6 (5th Cir. 1977); *United States v. Villalobos,* 161 F.3d 285, 290 (5th Cir. 1998). In the absence of such factors, Almanzar's eye contact with the driver of the station wagon was at least as consistent with innocence as with guilt.[1] In sum, there is no evidence that Almanzar's nervousness or anxiety derived from an underlying consciousness of criminal behavior.

## 2. Implausible Explanations

---

[1] It is just as reasonable to conclude that Almanzar's attention was directed to the station wagon because it was immediately in front of her. Observing law enforcement officials question the driver of another vehicle, in the absence of any other connection between the two drivers, is at least as likely to be a case of "rubbernecking."

12

"'[A] less than credible explanation' for a defendant's actions is 'part of the overall circumstantial evidence from which possession and knowledge may be inferred.'" *Diaz-Carreon,* 915 F.2d at 955 (quoting *United States v. Phillips,* 496 F.2d 1395, 1398 n.6 (5th Cir. 1974), *cert. denied,* 422 U.S. 1056 (1975)). The Government argues that Almanzar's story that her boyfriend of two months loaned her his car containing a large amount of contraband, without making arrangements for returning the car, is not credible. Significantly, however, no one asked Almanzar if she and Segura had a plan for returning the car to him. Customs agent Atedero-Lopez simply asked Almanzar if she knew how to contact Segura. Furthermore, Atedero-Lopez testified that he could not remember if Almanzar told him whether Segura knew how to get in touch with her.

Had Segura known where Almanzar lived or worked, he could have picked up the car himself or arranged for others to do so without requiring Almanzar to contact him. Such an explanation was found to be plausible in *Ortega Reyna,* in which the defendant explained at trial that, although he did not know the address or phone number of the truck's owner, they had made arrangements for the owner to pick up the truck in Houston. *Ortega Reyna,* 148 F.3d at 542-43. In contrast, in *Diaz-Carreon,* the defendant told customs officials that a man that he had met a few days earlier named "Ruben" had loaned him a truck so that he could find employment in New Mexico. *Diaz-Carreon,* 915 F.2d at 953. Unlike Almanzar, Diaz-Carreon testified at trial that he could not explain how "Ruben" would recover the pickup truck. *Id.* Unlike Diaz-Carreon, who borrowed

13

a truck from a virtual stranger he had met a few days earlier, Almanzar had been dating Segura for two months. It is not implausible that Segura loaned Almanzar his car for the short trip back to El Paso so that she could get to work on time.

This case also is distinguishable from *United States v. Molina-Iguado,* in which the driver of a vehicle containing nine kilograms of marijuana concealed inside a tire in the trunk told customs officials that her boyfriend, whom she refused to identify, had borrowed her car while she was in Mexico. *United States Molina-Iguado,* 894 F.2d 1452, 1456 (5th Cir.), *cert. denied,* 498 U.S. 831 (1990). In *Molina-Iguado*, agents also found additional marijuana of the same "texture and color" inside personal effects in the car driven by the defendant.[2] *Id.* at 1457. The court concluded that this "additional quantity of very similar marihuana found concealed inside women's clothing in a totebag in the car," together with the defendant's "inability to verify in any way her story about her boyfriend," was indicative of knowing possession. *Id.* Unlike Molina-Iguado, Almanzar identified her boyfriend by name and told customs agents the nightclubs that he frequented; moreover, no marijuana was found on Almanzar or inside the passenger compartment of the car that might have permitted an inference that she knew about the marijuana hidden in the trunk of

---

[2] Similarly, in *United States v. Olivier-Becerril,* customs agents found a small quantity of cocaine in the defendant's wallet, an additional factor considered by this court in concluding that the defendant knew that cocaine was hidden in a secret compartment in the trunk. *United States v. Olivier-Becerril,* 861 F.2d 424, 427 (5th Cir. 1988).

14

the car.

Without any evidence that Almanzar could not explain how the vehicle would be returned to Segura, Almanzar's story that her casual boyfriend loaned her his car for the short trip across the border to El Paso, so that she could get to work on time, is at least as consistent with innocence as guilt.

The Government also argues that Almanzar's story that she was worried about getting back to work is implausible given that she had three unexcused absences from work immediately before her arrest. However, Almanzar's employer's office manager, Sepulveda, testified that Almanzar missed work on April 7, 8 and 9; Almanzar was arrested on the morning of April 9. Sepulveda also testified that the company's attendance policy provided that after three consecutive absences without notification, a written warning would be given, and if the employee responded within 24 hours, he or she would not be fired. Thus, it is entirely plausible that although Almanzar had missed work for three days, she knew that she could keep her job if she reported to work within the 24-hour period. Therefore, Almanzar's statement that she was concerned about getting back to work is not implausible. The Government also suggests that Almanzar's three-day absence from work was connected to drug-trafficking activity. No evidence supports this assertion.

In the absence of evidence that Almanzar could not have explained how Segura's car would be returned, and in light of the testimony that Almanzar could have kept her job had she returned to work on the morning she was arrested, the circumstances surrounding

15

Almanzar's borrowing of her boyfriend's car to return to work after a date are not implausible.[2]

### 3.  Inconsistent Statements

This court has declared that "perhaps the strongest evidence of a criminal defendant's guilty knowledge is inconsistent statements to federal officials." *Diaz-Carreon,* 915 F.2d at 954-55 (citing *Richardson,* 848 F.2d at 513; *Williams-Hendricks,* 805 F.2d at 501).  Because inconsistent statements are inherently suspicious, a fact finder reasonably could conclude that they mask an underlying consciousness of guilt.  *Id.* at 955.  The Government argues that Almanzar's initial statement that she went to the Vertigo nightclub, and her later statement that she went to the XO nightclub, provide circumstantial evidence of guilty knowledge.

The Government did not ask Almanzar to explain why she initially told customs officials that she had been to Vertigo, and

---

[2] In comparison, this court has rejected as implausible the following dubious explanations given by defendants.  In *Resio-Trejo,* the defendant told customs officials that someone had taken his truck without his knowledge, spent several days constructing secret compartments in the gas tanks, loaded these compartments with $130,000 worth of marijuana, and then returned the truck to him.  *Resio-Trejo,* 45 F.3d at 913.  In *Richardson,* this court found "clearly suspicious" the defendant's story that on the day he arrived in Los Angeles to visit his ill mother, he "ran into" a female named "Rhonda" whom he had known for four or five years, but whose last name he could not recall.  *Richardson,* 848 F.2d at 512. Richardson told a DEA agent that because he did not have enough money to fly back to Dallas, he asked "Rhonda" to rent him a car. *Id.*  The evidence showed that someone named "Cassandra Rodney" paid a cash deposit of $370 for the rental car; a return ticket to Dallas would have cost only $60.  *Id.*  Richardson claimed that "later that evening someone dropped off a car in front of his mother's house and dropped the key to it through the mail slot," and he returned to Dallas at 2 o'clock the morning after his arrival.  *Id.* at 512, 513.

later told them that she had been to XO. Almanzar's daughter testified that the two clubs are across the street from each other in the same block and that when one club closes, patrons often walk across the street to the other club using the same wristband to gain free admission. Almanzar's statements are not necessarily inconsistent because it is possible that she may have gone to both neighboring nightclubs with Segura that evening. In *Ortega-Reyna,* 148 F.3d at 547, the defendant first stated that he was going to El Campo and later said he was traveling to Houston; however, we concluded that these statements were not inconsistent given his explanation that he planned to pick up equipment in El Campo and continue to Houston to enroll his children in school. Similarly, Ortega Reyna's statement that he was coming from Miguel Aleman, Mexico, and his wife's statement that they were coming from Roma, Texas, were not inconsistent because these were "simply sister cities on the opposite sides of the Rio Grande River – two municipalities comprising a single metropolitan area." *Id.* at 546.

In contrast, in *Anchondo-Sandoval,* the defendant initially told authorities that he had been in Mexico visiting friends or relatives, and that he was returning to Phoenix, Arizona to look for work as a field hand; he later stated that he was in Mexico to live cheaply while looking for work in El Paso, Texas and that he intended to return to Albuquerque, New Mexico to look for work in construction. *Anchondo-Sandoval,* 910 F.2d at 1237. *See also United States v. Del Aguila-Reyes,* 722 F.2d 155, 156 (5th Cir. 1983) (defendant initially told customs officials that this was the first

17

time that his brother had accompanied him on a trip to the United States, but he later said that his brother had accompanied him on a previous trip to Miami); *United States v. Martinez-Mercado,* 888 F.2d 1484, 1491 (5th Cir. 1989) (defendant initially told customs officials that an unidentified "they" had loaned him the truck to cross the border to look for work, even though he had no work permit; later, defendant asserted that "they" had paid him $300 to drive the truck to the United States to retrieve a semitrailer). Unlike these defendants' stories, Almanzar's two statements were not necessarily inconsistent because both could be true.

### 4. Exclusive Possession and Control
### For a Lengthy Time and Over a Great Distance

This court has permitted an inference of guilty knowledge when a defendant has possessed and controlled a vehicle containing hidden contraband for a long period of time and over a considerable distance, reasoning that the defendant likely would have detected the contraband. For example, in *Resio-Trejo,* this court concluded that a jury reasonably could infer that the defendant knew that marijuana was concealed in the gas tanks of a truck he was driving in part because the defendant had possession and exclusive control of the truck for ten months preceding the discovery. *Resio-Trejo,* 45 F.3d at 912. Likewise, in *Richardson,* 848 F.2d at 512, 514 n.4, we declared that "[t]he fact that Richardson had exclusive possession of the car, driving it alone [for seventeen hours] on a trip of over a thousand miles, is some evidence from which it might ordinarily be inferred that he was aware of the some two pounds of

18

cocaine in the wrapped packages sitting in the trunk." *See also McDonald,* 905 F.2d at 874 ("McDonald owned the car and had had possession for some time, facts which can suggest guilty knowledge").

The evidence indicated that Almanzar's boyfriend loaned his car to her in Ciudad Juarez at approximately 5:00 a.m., and that Almanzar was stopped at the Paso Del Norte port of entry in El Paso at approximately 5:10 a.m. In ten minutes, Almanzar drove only a short distance in crossing the bridge separating the border cities of Ciudad Juarez and El Paso. The Government presented no proof of ownership of the Honda. Because Almanzar possessed and controlled the Honda for a very brief period and she traveled a very short distance, no inference can be drawn that Almanzar was aware of marijuana hidden in the trunk of the vehicle. *See United States v. Tolliver,* 780 F.2d 1177, 1184 (5th Cir. 1986) (noting the "paucity of evidence indicating awareness by [the defendants] of the contraband's presence in a vehicle they did not own and were not shown to have controlled for more than a brief period"), *vacated and remanded on other grounds,* 479 U.S. 1074 (1987).

### 5.Odor of Marijuana or Scent Masking Odor

In *Lopez,* this court held that, although the bulk of the evidence adduced at trial was at least as consistent with innocence as it was with guilt[3], an inspector's testimony that he smelled a strong odor of marijuana in the vehicle "must tip the scales in

---

[3] This additional evidence in equipoise in *Lopez* was: (1) changing lanes prior to inspection; and (2) appearing nervous when asked to open the car trunk. *Lopez,* 74 F.3d at 578.

19

favor of providing a basis for affirming the verdict." *Lopez,* 74 F.3d at 578 ("a reasonable jury could rationally infer beyond a reasonable doubt that [the defendant] had knowledge of the hidden marijuana because its odor was present in the passenger compartment of the car he was driving"). *See also United States v. Gomez,* 776 F.2d 542, 549 (5th Cir. 1985) ("renting and driving the truck, loaded with over a thousand pounds of marijuana, smelling of marijuana and having marijuana debris on the tailgate[,] suffice to allow an inference that [the defendant] was aware of the presence of marijuana").

In *Olivier-Becerril,* 861 F.2d at 427, this court found that coffee and a fresh garlic wreath placed in a trunk to mask the odor of narcotics permitted an inference that the defendant was aware of the presence of marijuana in the vehicle. *See also Del Aguila-Reyes,* 722 F.2d at 156 (noting that "perfume is often used to mask the odor of drugs"); *Phillips,* 496 F.2d at 1398 (moth balls concealing scent of marijuana).

Inspector Madriles testified that there was no odor of marijuana in the Honda and that he did not recall smelling air freshener. Thus, the Government has produced no such "additional indicia that [Almanzar] was aware of the presence of drugs." *See Lopez,* 74 F.3d at 577-78.

### 6. Possession of Large Amounts of Cash

Possession of large amounts of cash may be circumstantial evidence of guilty knowledge, indicating that a defendant might have been compensated for his role in the attempt to smuggle

contraband into the country. *Ortega Reyna*, 148 F.3d at 548; *see also United States v. Crooks,* 83 F.3d 103, 107 (5th Cir. 1996) (when stopped, defendant had $1,400 in cash); *Del Aguila-Reyes,* 722 F.2d at 156 ($900 in cash); *Olivier-Becerril,* 861 F.2d at 425 ($500 in cash).

The Government presented no evidence that agents found any cash on Almanzar or in the Honda when she was stopped at the border. Thus, no inference can be made that she was being paid to smuggle marijuana into the United States. Indeed, the lack of evidence that Almanzar had cash when she entered the checkpoint tends to support her story that she borrowed her friend's car to return to El Paso. If Almanzar had money, she could have returned to El Paso as she had arrived, by taxi cab.

**7. Obvious or Remarkable Alterations to the Vehicle**

This court has permitted an inference of guilty knowledge of hidden contraband when the alterations to the vehicle are so obvious or remarkable that they easily would be discovered by a person in possession or control of the vehicle.

In *Resio-Trejo,* this court concluded that because the border patrol agent discovered secret compartments built in the fuel tank of a vehicle "simply by inserting a coat hanger in the gas tank, . . . the jury could reasonably infer that Resio would have made a similar discovery during his daily inspections or while refueling his truck [in the ten months that he possessed the vehicle]." *Resio-Trejo,* 45 F.3d at 913. *See also Martinez-Mercado,* 888 F.2d at 1491 (knowing possession inferred in part from "the fact that

21

the unusual nature of the fuel tanks and their special fittings were observable on exterior inspection").

Immigration inspector Madriles, who had 14 years experience, testified that when he opened the trunk, he saw new rubber molding and fresh paint applied to Bondo or fiberglass, leading him to believe that the trunk had been altered. Canine enforcement officer Picazzo testified that in order to reach the marijuana, he had to drill through sheet metal covering the spare tire well. Customs inspector Ramirez testified that a National Guard team took as long as 45 minutes to cut through the sheet metal with a saw.

Thus, considering the short time that Almanzar was in possession of the vehicle, the hidden compartment beneath freshly painted Bondo and sheet metal in the trunk was not necessarily obvious or readily accessible to her. Furthermore, the Government presented no evidence that Almanzar was familiar with the construction of the trunk of a Honda Prelude so that she would notice the alteration, if indeed she ever looked inside the trunk at all. In *Diaz-Carreon,* 915 F.2d at 954 n.4, this court rejected the Government's argument that the defendant should have suspected that the atypical freshly painted and swollen sideboards of the pickup truck concealed contraband because "the Government failed to introduce at trial any evidence demonstrating that Diaz-Carreon himself was familiar with the type of stake bed truck involved in this case."

Moreover, Almanzar did not admit that she knew that the trunk had been altered, or that she knew that "something" was in the

22

hidden compartment. *See McDonald,* 905 F.2d at 873 (after the inspectors found marijuana in the gas tank, the defendant admitted that "he had known 'something' was in the tank"); *United States v. Miller,* 146 F.3d 274, 281 (5th Cir. 1998) (defendant "admitted that he was aware that the bed [of the motor home] under which the drugs were later found had been modified").

In sum, the alterations to the trunk were not so obvious, or the hidden compartment so readily accessible, that an inference could be drawn that Almanzar had discovered the marijuana during the ten minutes that she drove the vehicle from Ciudad Juarez to El Paso.

### 8. Other Alleged Evidence of Guilty Knowledge

The Government argues that Almanzar's lack of identification permits an inference of guilty knowledge. Almanzar told customs officials that she had no identification because her purse had been lost and the Government offered no evidence that this statement was false or implausible.[4] Finally, the Government suggests that Almanzar was lying when she said that the Honda belonged to her boyfriend, pointing out that the Honda key was found on Almanzar's key ring. However, the Government did not present any evidence as to the ownership of the Honda. Furthermore, it is just as reasonable to infer that Almanzar placed a loose key on her own key

---

[4] Agent Atedero-Lopez testified that Almanzar's daughter gave him her mother's expired driver's license for identification after Almanzar's arrest, which her daughter said she found in her mother's dresser drawer, and not in her purse. This evidence tends to confirm Almanzar's statement that she lost her purse, which presumably would contain her current driver's license.

23

ring to avoid losing it.

## IV. CONCLUSION

Although we recognize that our review is limited to considering the evidence in the light most favorable to the Government, we conclude that the circumstantial evidence presented by the Government as a whole would support an equal or nearly equal theory of guilt and a theory of innocence[5], so that a reasonable jury *must necessarily entertain* a reasonable doubt. See *Sanchez*, 961 F.2d at 1173. Hence, as a matter of law, the evidence is insufficient to support a jury's finding beyond a reasonable doubt that Almanzar had knowledge of the marijuana in the hidden compartment of the vehicle she was driving. *See Ortega Reyna,* 148 F.3d at 545, 547.

Accordingly, Almanzar's conviction must be reversed.

REVERSED.

---

[5] "[F]or every inference of guilt that may be drawn from the evidence, there is an equal and opposite benign inference to be drawn." *Ortega Reyna,* 148 F.3d at 545.